**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LISA MAZUR,
for plaintiff and the class members defined herein,    )
    )
                    Plaintiff,    )
    )
    v.    )
    )
MILO'S KITCHEN, LLC,    )
DEL MONTE CORPORATION,    )
doing business as DEL MONTE FOODS,    )
and DOES 1-10,    )
    )
                    Defendants.    )

**COMPLAINT – CLASS ACTION**

**MATTERS RELEVANT TO MULTIPLE CLAIMS**

**INTRODUCTION**

1.      This is a class action brought by plaintiff, on behalf of all consumers who purchased certain dog treats manufactured, marketed, distributed, or sold by defendants.   The dog treats were unsafe, defective, dangerous, culpably misrepresented as safe and healthy, and did not conform to applicable implied and express warranties.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction, under 28 U.S.C. §1332(d).  The amount in controversy exceeds $5 million, exclusive of interest and costs.  Plaintiff and the class members are of diverse citizenship to the defendants.  There are over 100 class members.

3.      Personal jurisdiction over each defendant is proper because each:

(a)    Does and has done business in Pennsylvania and within this district, with the claims asserted herein arising from such business; and

(b)    Committed tortious acts that are the subject of the complaint in Pennsylvania, and within this district.

4.      Venue in this district is proper for the same reasons.

## PARTIES

5.     Plaintiff Lisa Mazur is an individual who resides in the Western District of Pennsylvania.

6.     Defendant Milo's Kitchen, LLC ("Milo's") is a limited liability company chartered under Delaware law.  Its address for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

7.     On information and belief, the sole member and manager of Milo's Kitchen, LLC is Del Monte Corporation, doing business as Del Monte Foods ("Del Monte"). Del Monte Corporation therefore had complete authority and control over Milo's conduct.

8.     Del Monte is a Delaware corporation with its  principal place of business located at One Maritime Plaza, San Francisco, CA 94111.  It does business in Pennsylvania.  Its registered agent and office is CT Corporation System, 1635 Market Street, Philadelphia, PA 19103.

9.     Milo's Kitchen and Del Monte are engaged in Pennsylvania and nationwide in the business of manufacturing, producing, marketing, distributing, advertising, or selling dog treats, including the Chinese-made chicken jerky dog treats at issue in this litigation.

10.     Defendants conduct this business through the Del Monte Pet Products division, of which the principal location is 2200 NW Brickyard Rd., Topeka, KS  66618-2814. The Del Monte Pet Products division is a business and financial reporting unit which is not coextensive with any legal entity.  It is one of the two major business units of Del Monte, the other being Consumer Products.  Each unit accounted for about half the Del Monte revenues.

11.     According to Del Monte's annual report on SEC Form 10-K for the year ending April 29, 2012 (original page 3), "Del Monte Corporation ('DMC') and its consolidated subsidiaries ('Del Monte' or the 'Company') is one of the country's largest producers, distributors and marketers of premium quality, branded pet products and food products for the U.S. retail market, generating approximately $3.7 billion in net sales in fiscal 2012. Our pet food

and pet snacks brands include well-known household brands such as Meow Mix, Kibbles 'n Bits, Milk-Bone, 9Lives, Pup-Peroni, Gravy Train, Nature's Recipe, Canine Carry Outs, Milo's Kitchen and other brand names...."

12.     The Del Monte Pet Products division thus includes substantially more than Milo's, but less than all of Del Monte.

13.     The Del Monte Pet Products division has a substantial share of all pet product sales in the United States.  According to the same 10-K, "Our pet products represent some of the leading pet food and pet snacks brands in the United States, with a strong presence in most major product categories. Our pet products portfolio includes well-recognized national brands such as Meow Mix, Kibbles 'n Bits, Milk-Bone, 9Lives, Pup-Peroni and Milo's Kitchen, as well as other brand names and private label products. We compete in the dry and wet dog food categories, with market shares of 7.7% and 2.6% in fiscal 2012, respectively; the dry and wet cat food categories, with market shares of 22.2% and 12.1%, respectively; and the dog snack category (excluding rawhide), with a market share of 32.3%, in fiscal 2012. We also compete in the cat treats category, with a market share of 4.4% in fiscal 2012."

14.     Defendants have spent millions of dollars in promoting trust and confidence among consumers in their pet food products.  They hold themselves out to the public as manufacturers of safe, nutritious, and high-quality pet food.

15.     Does 1-10 are other entities involved in the manufacture, sale, distribution, and marketing of the dog treats.

## FACTS

### In general

16.     Defendants manufactured dog treats made, in whole or in part, of chicken jerky.

17.     The packaging of the dog treats is depicted by Exhibit A.

18.     Defendants made several representations on the packaging, as follows:

3

a. The contents are "wholesome & delicious."

b. "We started making Milo's Kitchen dog treats because we believe your dog deserves treats made with the same quality of ingredients and care that you want with your food."

c. That the ingredients were chicken breast, glycerin, sugar, salt, natural flavors, mixed tocopherals (a preservative and natural source of Vitamin E).

19. Defendants made representations on the Del Monte and Milo's web sites (http://www.delmontefoods.com/brands/ and http://www.miloskitchen.com), as follows:

a. "Milo's Kitchen® Home-Style Dog Treats are 100% real jerky, sausage slices, and meatballs."

b. "We believe dogs deserve treats made with the same quality of ingredients and care that you want with your food. We're pet parents too. That's why we make each treat with the love and care your dog deserves."

c. "Our dogs share our lives. Those first eager greetings in the morning. That last curl-up and cuddle at the end of the day. Our dogs aren't just the four-legged members of our family. They're family. [¶ ]  So don't they deserve a treat that lives up to the high standards we set for the rest of our loved ones?   [¶ ] That's why we created Milo's Kitchen® dog treats. Because in our kitchen, our dogs deserve only the best, and we believe they deserve treats made with the same quality of ingredients and care that you want with your food. They deserve to enjoy snacks that not only look like jerky, sausage slices and meatballs, but actually are 100% real jerky, sausage slices and meatballs. Nothing says, "I love you"

4

more than something made with love and care."

d.  "Each tasty piece of Milo's Kitchen® Chicken Jerky is made with the quality and care your dog deserves. There are no artificial chicken flavors or filler ingredients. Just meaty, delicious whole fillets of 100% real jerky."

20.  Packaging for other dog treats marketed under the Milo's Kitchen brand provide similar statements regarding wholesomeness and suitability, as are found on Exhibit A.

21.  All of these representations, found on the packaging represented by Exhibit A, were false.

22.  The products containing chicken jerky that were sold under the Milo's brand were not wholesome, or nutritious; they were unhealthy.

23.  In fact, the FDA had issued warnings, as recently as November 18, 2011, about dog illnesses after consuming chicken jerky dog treats which were made in China.   Such warnings are contained within Exhibit B.

24.  Defendants' packaging did not warn of any danger from feeding its contents to dogs.

25.  There is a reference to the FDA warnings in the "frequently asked questions" on the Milo's Kitchen web site, but a purchaser will not see it unless they access the web site and click through the questions.  Furthermore, the warning is downplayed:

Milo's Kitchen® Home-Style Dog Treats

Safety and Quality Assurance | Milo's Kitchen® Chicken Jerky Dog Treats

The makers of Milo's Kitchen® dog treats are pet parents too, and the health and safety of your dog is our top priority. We realized that the U.S. Food & Drug Administration (FDA) issued a cautionary statement concerning chicken jerky dog treats from China. To clarify, all of Milo's Kitchen® dog treats, including our chicken jerky variety, are made with nutritious and quality ingredients that meet the standards and specifications of the United States Department of Agriculture (USDA), the Association of American Feed Control Officials (AAFCO) and the FDA.

The FDA reports that extensive testing of chicken jerky dog treats has been

conducted, but no contaminant has been found. No recalls have been issued for any chicken jerky dog treat product in the United States1 Additionally, the makers of Milo's Kitchen® have conducted our own extensive internal testing, all of which has shown our Chicken Jerky to be safe for dogs to enjoy.

We started making Milo's Kitchen® dog treats because we believe dogs deserve treats made with the same quality ingredients and care that we want for our food. After all, our dogs are family and they deserve to be treated like family. Each of our recipes is carefully prepared to bring out the flavors your dog loves, without using artificial flavors or colors.

To ensure that the resulting dog treats are both wholesome and safe for your dog, all of our dog treats are processed and packaged following strict quality-control procedures that are in compliance with the Good Manufacturing Practices established by the FDA. Our own Quality Assurance Program is based upon standards compliant with both the Global Food Safety Initiative and the FDA.

With regard to the reports about chicken jerky treats and "Fanconi-like Syndrome," the FDA has thoroughly investigated the complaints. Chicken jerky samples made in China were collected from all over the United States and tested for a wide variety of substances, including salmonella, metals, furans, pesticides, antibiotics, mycotoxins, rodenticides, nephrotoxins, and other chemicals/poisonous compounds.2 The FDA, the American Veterinarian Medical Association (AVMA) and several animal health diagnostic laboratories in the U.S. have not been able to identify any definitive cause, or a connection between the illness and chicken jerky dog treats.

Dog treats are intended to be used occasionally and in limited, recommended quantities, and should not be substituted for a balanced diet. We recommend that, as a guideline, no more than 15% of a dog's daily caloric intake should be comprised of treats. Feeding guidelines are placed on packages, and based on your dog's weight, we advise against exceeding the recommended amount.

Finally, keep in mind that the shelf life of Milo's Kitchen® dog treats is 18 months from the date of production. The "Best if Used By" date will be listed either on the back or on the bottom of the package.

http://www.fda.gov/AnimalVeterinary/NewsEvents/CVMUpdates/ucm280586.htm

http://www.fda.gov/AnimalVeterinary/SafetyHealth/ProductSafetyInformation/ucm295445.htm

® Chicken Jerky is made with the quality and care your dog deserves. There are no artificial chicken flavors or filler ingredients. Just meaty, delicious whole fillets of 100% real jerky.

26.     Defendants marketed their products without first determining that the

products are safe, and that they will not have a deleterious effect on dogs.

27.     Defendants marketed chicken jerky dog treats  without first determining

that the products were safe, and that the dog treats would not have a deleterious effect on dogs.

28.     Defendants' chicken jerky products, per the labels found on <u>Exhibit A</u>, are "Made In China."  On information and belief, the products are made in the People's Republic of China.

29.     Prior to February 1, 2012, defendants had received numerous complaints, relating to more than 100 incidents, regarding dog treats containing chicken jerky imported from China which caused dogs to become sick or die.

30.     Dog treats sold in Australia which contained chicken jerky made in China were recalled in 2008 by KraMar Pet Company Pty. Ltd., after scores of dogs in that country were sickened.  See Kemp, Miles, "Hunt To Track Source Of Dog Meat Poison," *Adelaide Advertiser*, Dec. 9, 2008 at 9; Australian Veterinary Association, "Pet Owners Should Stay Vigilant After Chicken Treat Recall" (press release), Dec. 10, 2008; and Williams, Bronwyn, "Kidney Disease Brings Warning To Dog Owners," *Hobart Mercury*, Jan. 5, 2009 at 8.  (<u>Exhibit C</u>.)

31.     Numerous  complaints concerning Milo's chicken jerky treats sickening or killing dogs were made on the internet.  Examples are attached as <u>Exhibit D</u>.

32.     Defendants placed no warnings concerning their products on their packaging.

33.     Defendants knew that there was a substantial risk of death or harm associated with their dog treats.

34.     No reasonable person would feed dog treats to their dogs knowing that there was a substantial risk of death or illness from doing so.  Plaintiff, and other consumers, did not learn of the FDA warning, until after their dogs had consumed the treated and either became ill or passed away.

35.     Defendants intentionally concealed known facts concerning the safety of their dog treats in order to increase or maintain sales.

36.     The fact that the dog treats might cause serious illness or death either at the recommended level, or at some larger level, was and is a material fact to pet owners.  Most pet owners (if not all of them) would not want to feed their pet such a treat, or have such a treat in a location where an animal might obtain more than the recommended number of servings.

37.     Dog owners consider their pets to be members of the family, and become very distressed when their dogs pass away, or become seriously ill.   Indeed, the Del Monte Corporation 10-K, *supra*,  states (original page 4): "The 'humanization' of pets continues to be a key driving factor in the growth of the pet market. The growing importance of pets as part of the family, increased rates of value-added new pet product entries and increased prices have contributed to significant growth in this category."  The same document also states (original page 5): "We believe that growth in the pet food and snacks categories will continue to be fueled by pricing, as well as higher consumer spending on more premium products due to the heightened importance of pets as part of the family and growth in the pet population. Over half of all American households own a dog or a cat."

38.     The conduct of defendants recklessly or maliciously disregarded the rights of plaintiff and the class members, for motives of pecuniary gain.

*Lisa Mazur*

39.     On or about December 12, 2011, Lisa Mazur purchased a package of Milo's Kitchen chicken jerky dog treats from a Giant Eagle store in New Kensington, Pennsylvania.

40.     Plaintiff owned a 30 pound dog, Riley Rae.  On January 31, 2012, he was 7 years old, and in good health.

41.     In January 2012, plaintiff fed Riley Rae defendants' chicken jerky treats on occasion.  There were no other material changes in his diet.

42.     On February 1, 2012, Riley Rae became ill and was taken to the vet, where he was diagnosed with kidney failure.  After intravenous fluids for two days did not

produce any improvement, the vet suggested euthanasia.

43.     Plaintiff took Riley Rae to a second vet, who administered fluids 24 hours per day for two days.

44.     When that produced no improvement, plaintiff was forced to have Riley Rae euthanized on February 5, 2012.

45.     Plaintiff gave notice of her claim to defendants.

46.     Plaintiff suffered economic damages as a result of defendants' conduct, including:

(a)     the value of her dog;

(b)     veterinary expenses incurred in treating the dog and attempting to save his life;

(c)     the cost of disposition of the dog; and

(d)     the cost of the defendants' product.

47.     Consumers in Pennsylvania, and across the United States, suffered damages similar to those suffered by plaintiff, as a result of defendants' conduct.

## COUNT I – BREACH OF IMPLIED WARRANTY; UNIFORM COMMERCIAL CODE AND MAGNUSON-MOSS ACT

48.     Plaintiff incorporates paragraphs 1-47.

49.     Under the Uniform Commercial Code ("UCC") – in force throughout the United States except in Louisiana and Puerto Rico – there is an implied warranty in the sale of goods by a merchant that the goods shall be merchantable.  The Pennsylvania citation is 13 Pa.C.S. § 2314.

50.     Under 13 Pa.C.S. § 2314(b), "Goods to be merchantable must be at least such as.... (3) are fit for the ordinary purposes for which such goods are used; and... (6) conform to the promises or affirmations of fact made on the container or label if any."

51.     The dog treats sold by defendants were not fit for feeding to dogs, and did not conform to the promises or affirmations of fact made on the packaging.

9

## CLASS ALLEGATIONS

52.     Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), on behalf of a class and subclass.

53.     The class consists of all persons in the United States (except Louisiana and Puerto Rico) who purchased any dog treat product containing chicken jerky manufactured or sold by defendants and containing chicken imported from China, on or after a date four years prior to the filing of this action.

54.     The subclass consists of class members whose dogs suffered harm or death due to the consumption of defendants' products.

55.     The members of the class and subclasses are so numerous that joinder of all members is impracticable.  Thousands of persons purchased the dog treats at issue, and hundreds of dogs died as a result.

56.     There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members.  The predominant common questions include:

      (a)     whether the products sold by defendants were materially defective in design and formulation and unfit for consumption by dogs;

      (b)     whether the products sold by defendants were contaminated;

      (c)     whether defendants failed to properly test the products prior to market entry (or at any other relevant time);

      (d)     whether defendants failed to warn of the dangers of their products; and

      (e)     whether defendants breached implied warranties.

57.     Plaintiff's claims are typical of the claims of the class members.  All are based  on the same factual and legal theories.

58.      Plaintiff will fairly and adequately represent the interests of the class

members.  Plaintiff has retained counsel experienced in consumer class action litigation.

59.     A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class, and against defendants, for:

(a)     Compensatory damages;

(b)     Costs of suit, expenses and attorney's fees (pursuant to 15 U.S.C. §2310); and

(c)     Such other or further relief as the Court deems proper.

## COUNT II – BREACH OF EXPRESS WARRANTY; UNIFORM COMMERCIAL CODE

60.     Plaintiff incorporates paragraphs 1-47.

61.     Under UCC §2-313, in force throughout the United States except Louisiana and Puerto Rico, the representations on defendants' packaging created an express warranty that the contents shall conform to the representations.  The Pennsylvania citation is 13 Pa.C.S. § 2314.

62.     Defendants' representations became a part of the basis of the bargain.

63.     Defendants breached those representations, as described above.

## CLASS ALLEGATIONS

64.     Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), on behalf of a class and subclass.

65.     The class consists of all persons in the United States (except Louisiana and Puerto Rico) who purchased any dog treat product containing chicken jerky manufactured or sold by defendants and containing chicken imported from China, on or after a date four years prior to the filing of this action.

66.     The subclass consists of class members whose dogs suffered harm or death

11

due to the consumption of defendants' products.

67.     The members of the class and subclass are so numerous that joinder of all members is impracticable.  Thousands of persons purchased the dog treats at issue, and hundreds of dogs died as a result.

68.     There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members.  The predominant common questions include:

     (a)     whether the products sold by defendants were materially defective in design and formulation and unfit for consumption by dogs;

     (b)     whether the products sold by defendants were contaminated;

     (c)     whether defendants failed to properly test the products prior to market entry (or at any other relevant time);

     (d)     whether defendants failed to warn of the dangers of their products; and

     (e)     whether defendants breached express warranties.

69.     Plaintiff's claims are typical of the claims of the class members.  All are based  on the same factual and legal theories.

70.     Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer class action litigation.

71.     A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class, and against defendants, for:

     (a)     Compensatory damages;

     (b)     Costs of suit; and

     (c)     Such other or further relief as the Court deems proper.

### COUNT III – VIOLATIONS OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

72.     Plaintiff incorporates paragraphs 1-47.

73.     Defendants engaged in unfair and deceptive acts and practices, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §201-1 *et seq.*

74.     The statutes were violated by defendants as they

(i)      produced, or sold, dog treats that were materially defective in design and formulation or contaminated, and unfit for consumption by dogs;

(ii)     represented that the treats were healthy and wholesome when they were not (whether on the packaging, on the internet, or otherwise);

(iii)    sold dog treats with such representations without properly testing the products to determine if they conformed to the representations;

(iv)     continued to sell dog treats after defendants knew or should have known that the representations being made about them were false; and

(v)      either failed to warn of the dangers of their products, or concealed such dangers, or both.

75.     The unfair and deceptive actions of defendants were done in the course of retail business, trade and commerce.  Further, a deleterious impact on the public interest (specifically, the public's interest in ensuring that its pet food supply is safe for consumption) was caused by defendants' conduct.

76.     Damages, in the form of the illnesses and deaths suffered by consumers' pets, and the fact that the product has no value if it is unwholesome and unfit for consumption by animals, were suffered by consumers as a result of defendants' actions.

77.     The actions of defendants were taken willfully, knowingly, or in reckless

13

disregard of the interests of consumers, thereby justifying the award of punitive damages under various state statutes. Specifically, defendants either deliberately concealed, or were willfully blind to, facts relevant to the question of whether its dog treats were wholesome, healthy and fit for consumption. Notwithstanding that, defendants represented that Milo's Kitchen dog treats were wholesome, when they were not, with the intent of having consumers rely upon that false representation and purchase Milo's Kitchen products, to defendants' benefit. Such behavior is unfair, fraudulent, and unconscionable.

## CLASS ALLEGATIONS

78.     Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), on behalf of a class and subclass.

79.     The class consists of all persons in Pennsylvania who purchased any dog treat product containing chicken jerky manufactured or sold by defendants and containing chicken imported from China, on or after a date six years prior to the filing of this action.

80.     The  subclass consists of class members whose dogs suffered harm or death due to the consumption of defendants' products.

81.     The members of the class and subclass are so numerous that joinder of all members is impracticable. Thousands of persons purchased the dog treats at issue, and hundreds of dogs died as a result.

82.     There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members. The predominant common questions include:

(a)     whether the products sold by defendants were materially defective in design and formulation and unfit for consumption by dogs,

(b)     whether the products sold by defendants were contaminated,

(c)     whether defendants failed to properly test the products prior to market entry (or at any other relevant time),

14

(d)     whether defendants misrepresented the qualities and benefits of their dog treats,

(e)     whether defendants failed to warn of the dangers of their products, and

(f)     whether defendants' culpability is such that they should be required to pay punitive damages.

83.     Plaintiff's claims are typical of the claims of the class members.  All are based on the same factual and legal theories.

84.     Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer class action litigation.

85.     A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff  and the class, and against defendants, providing relief allowed by 73 Pa. Stat. 201-9.2 and any other state law, as follows:

(a)     an award to each class member of actual damages or $100 (whichever is greater);

(b)     treble damages;

(c)     attorney's fees, litigation expenses and costs; and

(d)     such other or further relief as the Court deems proper.

## COUNT IV – COMMON LAW FRAUD

86.     Plaintiff incorporates paragraphs 1-47.

87.     Defendants committed fraud by

(a)     representing that the treats were healthy and wholesome when they were not (whether on the packaging, on the internet, or otherwise);

(b)     selling dog treats with such representations without properly

15

testing the products to determine if they conformed to the

representations;

(c)     continuing sales of the dog treats after defendants knew that the

representations about them were false; and

(d)     either failing to warn of the dangers of their products, or

concealing such dangers, or both.

88.     Any person purchasing defendants' dog treats relied on such

representations and omissions, as they go to the fitness of the product for its intended use.

89.     Damages, in the form of the illnesses and deaths suffered by consumers'

pets, and the fact that the product has no value if it is unwholesome and unfit for consumption by

animals, were suffered by consumers across the United States as a result of defendants' actions.

## CLASS ALLEGATIONS

90.     Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), on

behalf of a class and a subclass.

91.     The class consists of all persons who purchased any dog treat product

containing chicken jerky manufactured or sold by defendants and containing chicken imported

from China, on or after a date two  years prior to the filing of this action.

92.     The subclass consists of class members whose dogs suffered harm

or death due to the consumption of defendants' products.

93.     The members of the class and subclass are so numerous that joinder of

all members is impracticable.  Thousands of persons purchased the dog treats at issue and

hundreds of dogs died as a result.

94.     There are questions of law and fact common to the members of the class,

which predominate over any questions that affect only individual class members.  The

predominant common questions include:

(a)     whether the products sold by defendants were materially defective

16

in design and formulation and unfit for consumption by dogs;

(b)    whether the products sold by defendants were contaminated;

(c)    whether defendants failed to properly test the products prior to market entry (or at any other relevant time);

(d)    whether defendants misrepresented the qualities and benefits of their dog treats;

(e)    whether defendants failed to warn of the dangers of their products; and

(f)    whether defendants' culpability is such that they should be required to pay punitive damages.

95.    Plaintiff's claims are typical of the claims of the class members.  All are based on the same factual and legal theories.

96.    Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer class action litigation.

97.    A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class, and against defendants, for:

(a)    Compensatory damages;

(b)    Punitive damages;

(c)    Attorney's fees, litigation expenses, and costs of suit; and

(d)    Such other or further relief as the Court deems proper.

## COUNT V – UNJUST ENRICHMENT

98.    Plaintiff incorporates paragraphs 1-47.

99.    Defendants obtained a benefit, to which they were not entitled, through the sale of substandard dog treats for the purchase price thereof.

17

100.     Defendants had knowledge of the benefit conferred upon them by plaintiff and others like plaintiff.  Defendants made a calculated profit from the sales of the dog treats, while plaintiff and others like plaintiff suffered damages as a result of the transactions.

101.     Defendants have voluntarily and deliberately accepted and retained those profits and benefits, without delivering safe and healthy dog treats.

102.     Defendants' retention of the money they obtained (from plaintiff and others like plaintiff) from the sale of defective dog treats constitutes unjust enrichment.

## CLASS ALLEGATIONS

103.     Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), on behalf of a class.

104.     The class consists of all persons who purchased any dog treat product containing chicken jerky manufactured or sold by defendants and containing chicken imported from China, on or after a date two years prior to the filing of this action.

105.     The members of the class are so numerous that joinder of all members is impracticable.  Thousands of persons purchased the dog treats at issue, and hundreds of dogs died as a result.

106.     There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members.  The predominant common questions include:

(a)     whether the products sold by defendants were materially defective in design and formulation and unfit for consumption by dogs;

(b)     whether the products sold by defendants were contaminated;

(c)     whether defendants failed to properly test the products prior to market entry (or at any other relevant time);

(d)     whether defendants negligently, recklessly or intentionally delayed initiating recalls of the products;

18

(e)    whether defendants negligently, recklessly or intentionally failed to warn of the dangers of their products; and

(f)    whether defendants were unjustly enriched as a result of their wrongful conduct.

107.    Plaintiff's claims are typical of the claims of the class members.  All are based  on the same factual and legal theories.

108.    Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer class action litigation.

109.    A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class, and against defendants, for:

(a)    Compensatory damages,

(b)    Costs of suit, and

(c)    Such other or further relief as the Court deems proper.

### COUNT VI – NEGLIGENCE

110.    Plaintiff incorporates paragraphs 1-47.

111.    Defendants owed plaintiff and others like plaintiff a duty of care to offer pet food free from deleterious and harmful effects.

112.    Defendants breached that duty of care by selling dog treats that were harmful and deleterious,

(a)    without conducting adequate quality control and testing;

(b)    without using proper manufacturing and production practices;

(c)    without adequately investigating reports of pet deaths and illnesses following consumption of their dog treats;

(d)    without placing adequate warnings on the packaging; and

        (e)     by otherwise acting in a careless, negligent or reckless manner.

113.    Defendants knew or should have known that their dog treats posed an unacceptable and unreasonable risk of harm to dogs, which would not be recognized by purchasers of their product, and that the consumption of their products by dogs would result in foreseeable and reasonably avoidable property damage.

114.    Defendants' conduct was negligent, careless, or reckless.

115.    As a direct and proximate result of defendants' conduct, plaintiff and the class members suffered property damage, including the sickness and death of consumers' pets.

### CLASS ALLEGATIONS

116.    Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and (b)(3), on behalf of a class of all persons who purchased any dog treat product containing chicken jerky manufactured or sold by defendants and containing chicken imported from China, on or after a date two years prior to the filing of this action, whose dogs suffered harm or death due to the consumption of defendants' products.

117.    The members of the class  are so numerous that joinder of all members is impracticable.  Thousands of persons purchased the dog treats at issue, and hundreds of dogs died as a result.

118.    There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members.  The predominant common questions include:

        (a)     whether the products sold by defendants were materially defective in design and formulation and unfit for consumption by dogs;

        (b)     whether the products sold by defendants were contaminated;

        (c)     whether defendants failed to properly test the products prior to market entry (or at any other relevant time);

        (d)     whether defendants negligently, recklessly or intentionally delayed

initiating recalls of the products;

(e)     whether defendants negligently, recklessly or intentionally failed to warn of the dangers of their products;

(f)     whether defendants breached their duty of care to plaintiff and the class members; and

(g)     whether defendants' culpability is such that they should be required to pay punitive damages.

119.     Plaintiff's claims are typical of the claims of the class members.  All are based on the same factual and legal theories.

120.     Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer class action litigation.

121.     A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class, and against defendants, for:

(a)     Compensatory damages;

(b)     Punitive damages;

(c)     Costs of suit; and

(d)     Such other or further relief as the Court deems proper.

**COUNT VII – STRICT PRODUCTS LIABILITY;
DEFECTIVE DESIGN OR MANUFACTURE**

122.     Plaintiff incorporates paragraphs 1-47.

123.     Plaintiff and the class members purchased dog treats which were manufactured, distributed or sold by defendants.

124.     The dog treats were defective and inherently and unreasonably dangerous and unsafe for their intended use because they caused injury, illness or death to the dogs of plaintiff and others like plaintiff.

21

125.    The dog treats failed to perform in the manner reasonably to be expected, in light of their nature and intended function.

126.    As a direct and proximate cause of the unreasonably dangerous condition of the dog treats, plaintiff and others like them suffered property damage and economic loss.

## CLASS ALLEGATIONS

127.    Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3),  on behalf of a class.

128.    The class consists of all persons who purchased any dog treat product containing chicken jerky manufactured or sold by defendants and containing chicken imported from China, on or after a date two years prior to the filing of this action, whose dogs suffered harm or death due to the consumption of defendants' products.

129.    The members of the class  are so numerous that joinder of all members is impracticable.  Thousands of persons purchased the dog treats at issue, and hundreds of dogs died as a result.

130.    There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members.  The predominant common questions include:

    (a)    whether the products sold by defendants were materially defective in design and formulation and unfit for consumption by dogs;

    (b)    whether the products sold by defendants were contaminated;

    (c)    whether defendants failed to properly test the products prior to market entry (or at any other relevant time); and

    (d)    whether defendants' culpability is such that they should be required to pay punitive damages.

131.    Plaintiff's claims are typical of the claims of the class members.  All are based  on the same factual and legal theories.

132.     Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer class action litigation.

133.     A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class, and against defendants, for:

      (a)     Compensatory damages;

      (b)     Punitive damages;

      (c)     Costs of suit; and

      (d)     Such other or further relief as the Court deems proper.

## COUNT VIII – STRICT PRODUCTS LIABILITY; FAILURE TO WARN

134.     Plaintiff incorporates paragraphs 1-47.

135.     Plaintiff, and others, purchased dog treats which were manufactured, distributed or sold by defendants.

136.     Defendants' product was under the exclusive control of defendants, and was sold without adequate warnings regarding the health risks of the product.

137.     Defendants had a duty to warn purchasers of the health risks posed by their product in an effective manner.  Such warnings should have been placed on the packaging and at the point of sale, or should have otherwise been placed in a way calculated to give reasonable fair warning to consumers.

138.     As a direct and proximate cause of the defendants' failure to warn of the health risks of  the dog treats, plaintiff, and others, suffered property damage and economic loss.

## CLASS ALLEGATIONS

139.     Plaintiff brings this claim, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), on behalf of a class.

140.     The class consists of all persons who purchased any dog treat product

containing chicken jerky manufactured or sold by defendants and containing chicken imported from China, on or after a date two years prior to the filing of this action, whose dogs suffered harm or death due to the consumption of defendants' products.

141.    The members of the class  are so numerous that joinder of all members is impracticable.  Thousands of persons purchased the dog treats at issue, and hundreds of dogs died as a result.

142.    There are questions of law and fact common to the members of the class, which predominate over any questions that affect only individual class members.  The predominant common questions include:

      (a)    whether defendants failed to warn of the dangers of their products; and

      (b)    whether defendants' culpability is such that they should be required to pay punitive damages.

143.     Plaintiff's claims are typical of the claims of the class members.  All are based  on the same factual and legal theories.

144.    Plaintiff will fairly and adequately represent the interests of the class members.  Plaintiff has retained counsel experienced in consumer class action litigation.

145.    A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendants for:

      (a)    Compensatory damages;

      (b)    Punitive damages;

      (c)    Costs of suit; and

      (d)    Such other or further relief as the Court deems proper.

/s/ Clayton S. Morrow
Clayton S. Morrow

Clayton S. Morrow
MORROW & ARTIM, PC
304 Ross Street
7th Floor
Pittsburgh, PA 15219
(412) 209-0656
(412) 386-3184 FAX
clay@PaCreditCardLaw.com


Pro hac vice admission to be sought:

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

/s/ Clayton S. Morrow
Clayton S. Morrow

25

## <u>NOTICE OF ASSIGNMENT</u>

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

<u>/s/ Clayton S. Morrow</u>
Clayton S. Morrow